UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v.                                           )<br>)<br>FREDERICK DECHRISTOFORO, )<br>)<br>Defendant.                        ) | Criminal No. 22-cr-10304-DJC |

**MEMORANDUM AND ORDER**

**CASPER, J.**                                                                                                                February 6, 2024

## I.  Introduction

Defendant Frederick DeChristoforo ("DeChristoforo") has moved to suppress the fruits of searches (and any statements or other information obtained as result of same) conducted at his residence and his office pursuant to search warrant issued on December 7, 2021. D. 84. Having considered DeChristoforo's motion papers, D. 84-85, the government's opposition, D. 90, and having heard oral argument from counsel, D. 91, the Court DENIES the motion.

## II.  Findings of Fact

### A.  Application to Search DeChristoforo's Residence and Office

On December 7, 2021, Cormac Frost, a special agent with Homeland Security Investigations, submitted an affidavit ("Frost Affidavit") in support of search warrant applications for DeChristoforo's residence at 402 Grove Street in Norwell, Massachusetts ("402 Grove Street") and his office at 110 Corporate Park Drive, Unit 1910 in Pembroke, Massachusetts ("110 Corporate Park Drive"). D. 85-1 ¶ 8. SA Frost recounted his training and experience in the drug

1

investigations including but not limited to surveillance, execution of search warrants and arrests, and debriefings of informants, id. ¶¶ 2-7, and the types of drug-related evidence that may be found at drug traffickers' residences including drugs, drug ledgers, large sums of money, records of wire transfers, items that identify the ownership of the subject premises, contacts, cell phones and cell phone records. Id. ¶¶ 51-68.

As to this particular investigation, SA Frost recounted that federal agents had been investigating the distribution of counterfeit Adderall pills laced with methamphetamine. Id. ¶ 10. In the course of that investigation, law enforcement had received information through several means including information from cooperating witnesses ("CW") including individuals identified in the Frost Affidavit as CW1, CW2 and CW3. Id. ¶¶ 11-36. Each of the CWs was cooperating with law enforcement for consideration of their own pending, criminal charges. Id. ¶¶ 11 n.1, 13 n.2, 22 n.4.

On October 26, 2020, agents received information from CW1 that DeChristoforo manufactures and sells pills that contained a mixture of Adderall and methamphetamine. Id. ¶ 11. CW1 reported that DeChristoforo was involved with steroids and operated under the company name, Millennium Labs. Id. CW1 informed the agents that he had purchased steroids and Adderall pills from distributors supplied by DeChristoforo and had seen the Millennium Labs branding. Id. CW1 also recounted additional information about DeChristoforo's business that the CW1 had learned from his distributors: that DeChristoforo wanted to sell a pill press, that he received packages from China and that pill orders from him had to be paid in hundreds. Id. ¶ 12.

CW2, who provided information to law enforcement on September 21, 2021, was friends with DeChristoforo and had worked for him distributing drugs. Id. ¶¶ 14-16. CW2 had been charged with the sale of counterfeit Adderall pills laced with methamphetamine to an undercover

agent between January 2021 and June 2021. Id. ¶ 13. CW3 provided more information about DeChristoforo's drug operation. Id. ¶¶ 13-21. This person explained that DeChristoforo is involved in the distribution of Percocet, Adderall pills, testosterone and anabolic steroids and that CW2 would distribute drugs for him. Id. ¶¶ 15-16. CW2 would buy 500 to 1,000 methamphetamine pills per week from DeChristoforo for approximately $2,000 to $5,000 and would pay him in cash. Id. ¶ 20 CW2 recounted that DeChristoforo used a "wood shop" in Pembroke, later identified as 110 Corporate Park Drive, as the place where he manufactured and stored the methamphetamine laced pills and he had his pill press machine and other drug manufacturing supplies there. Id. ¶ 18. CW2 also explained that DeChristoforo had a hidden space in the attic at his residence, 402 Grove Street, where he likely keeps money. Id. ¶ 17. CW2 provided more information about DeChristoforo's receipt of packages from China, namely that he would wire money there for payment for drugs that he was importing. Id. ¶ 19. CW2 reported that DeChristoforo used multiple locations to import or ship drugs and used different people as recipients, including CW2 who had received packages for him in the past. Id. ¶ 19. Although CW2 notes that DeChristoforo had ceased drug trafficking for a month when he learned of a possible investigation of him (and moved equipment from 110 Corporate Park Drive to a storage unit), he further shared that DeChristoforo resumed his drug trade and reportedly produced up to 25,000 pills. Id. ¶ 21.

    CW3 provided information to law enforcement on November 16, 2021 and December 2, 2021 about DeChristoforo's drug operation. Id. ¶ 26. CW3 has been charged with selling counterfeit Adderall pills laced with methamphetamine to an undercover agent. Id. ¶ 22. During the execution of a search warrant on CW3's residence, agents found a large wooden box that contained, among other things, pills that tested positive for methamphetamine and drug

manufacturing and distribution paraphernalia including scales, and they also seized a pill press and parts for same and labs that contained the brand name Millenium Pharmaceuticals. Id. ¶ 25. Initially, CW3 received steroids from DeChristoforo, but in approximately 2019, CW3 began to get pills from him. Id. ¶¶ 26-27. CW3 explained that DeChristoforo manufactured both Adderall and fentanyl pills. Id. ¶ 27. DeChristoforo supplied the counterfeit Adderall pills that CW3 sold to the undercover agent. Id. ¶ 28. CW3 also noted that DeChristoforo himself had an opioid habit and that he seen fentanyl pills and cash inside the kitchen cabinets of his residence, 402 Grove Street. Id. ¶ 30. CW3 had last been to DeChristoforo's residence the week before November 3, 2021. Id. ¶ 32. As to DeChristoforo's office location, 110 Corporate Park Drive, CW3 confirmed that DeChristoforo manufactured drugs there and identified his shop as Unit 1910, as CW3 had also been to this location on multiple occasions. Id. ¶ 33. CW3 noted that DeChristoforo's BMW is often parked outside of Unit 1910. Id. ¶ 33. CW3 noted that DeChristoforo had stopped producing pills approximately eight to nine months prior after learning of a possible investigation of him and CW3 was not sure if any items or tools for manufacturing the counterfeit pills would still be at 110 Corporate Park Drive. Id. ¶ 35. CW3 noted, however, that DeChristoforo still may have a supply of drugs in a desk drawer, which CW3 had observed there in approximately October 2021. Id.

After receiving information from the CWs, the agents concluded surveillance in and or 110 Corporate Park Drive and 402 Grove Street, the addresses associated with DeChristoforo. On various dates between November 16 and December 2, 2021, agents observed the BMW, later identified as DeChristoforo's, outside of 110 Corporate Park Drive. Id. ¶ 37.[1] On November 19,

---

[1] The BMW is registered to Prophet Management, LLC, a company that listed DeChristoforo as its manager. Id. ¶ 37. CW3 had identified that DeChristoforo had some association with a "Prophet Reality" company. Id. ¶ 36.

4

2021, agents observed the BMW leave 110 Corporate Park Drive and go into the garage at 402 Grove Street. Id. ¶ 39. On December 1, 2021, agents saw the BMW parked outside of 110 Corporate Park Drive. Id. ¶ 40. A woman arrived in a Blue Tahoe and went inside unit 1910. Id. A short time later, a man arrived in a red truck and parked next to the BMW and the woman exited the unit to greet him and both went inside. Id. ¶ 41. Approximately ten minutes later, the woman emerged and put a small brown box inside the Tahoe. Id. ¶ 42. The man emerged and began to put large rectangular and square, wooden objects into the bed of the red truck and the female began to assist him. Id. A short time later, the woman got into DeChristoforo's BMW and moved it next to her Tahoe and then moved the Tahoe closer to Unit 1910's bay door, perhaps to allow DeChristoforo to check and fill the tires on the Tahoe. Id. ¶ 43. After all three were engaged in conversation, the man left in the red truck and the female left in the Tahoe. Id. ¶¶ 44-45. Agents followed the vehicles to a location in Weymouth where the man and the woman unloaded the wooden objects from the vehicles into a residence there. Id. ¶¶ 47-48. On December 2, 2021, agents observed DeChristoforo at 110 Corporate Park Drive. He was observed going from the rear and front passenger side of his BMW to the rear driver's side and appeared to be moving something around. Id. ¶ 49. An agent saw a large wooden object in the back of the BMW which appeared to be a similar natural wood color to the large wooden box seized during the search of CW3's residence and the wooden objects taken to the Weymouth residence the previous day. Id. ¶ 49. Later that day, agents observed DeChristoforo leave 110 Corporate Park Drive in the BMW and drive to the parking lot of a business center in Pembroke, Massachusetts. Id. ¶ 50. Although the agent could not see if DeChristoforo was carrying anything, he observed him exit the BMW and approach a white Nissan sedan with a Florida license plate. Id. This vehicle is an Enterprise rental car that was rented to Ivaldano Mendes, who has charges relating to possession and

distribution of drugs. Id. n.10. Several seconds later, DeChristoforo returned to the BMW and left the area, heading in the direction of 110 Corporate Park Drive and the white Nissan then also left the parking lot quickly. Id. ¶ 50.

### B.    Issuance and Execution of the Search Warrants on Both Locations

SA Frost's Affidavit was filed in support of applications to search DeChristoforo's residence at 402 Grove Street and his work space at 110 Corporate Park Drive. D. 85-1 at 25-28; D. 85-2; D. 85-3. The search warrant application sought to seize evidence of illegal controlled substances including but not limited to methamphetamine, Percocet, fentanyl and prescription pills; items associated with the manufacturing of pills; paraphernalia for packaging and distributing controlled substances; ledgers and other papers related to sale, storage and distribution of controlled substances; items reflecting names and contact information for co-conspirators, drug suppliers and customers; cash, currency and financial records relating to drug trafficking transactions; items relating to ownership of bank accounts or other financial assets and vehicles, property or storage facilities and the target locations; items such as airbills, labels and receipts regarding shipments; and cell phones or other electronic devices and data related to same. D. 85-1 at 27-28. The Court (Bowler, M.J.) issued the search warrants on December 7, 2021 and agents executed them on the two locations on December 8, 2021. D. 90 at 1. At DeChristoforo's residence, 402 Grove Street, the agents seized approximately 81 grams of fentanyl in the kitchen. Id.

### III.   Procedural History

On November 10, 2022, DeChristoforo was charged in this case with possession with intent to distribute 40 grams or more of fentanyl. D. 1. On December 1, 2023, he filed the present motion to suppress. D. 84. The Court heard oral argument from counsel on January 30, 2024 and took the matter under advisement. D. 91.

## IV.     Discussion

### A.     Probable Cause Required for Issuance of Search Warrant

The Fourth Amendment requires probable cause for issuance of search warrant. Whiteley v. Warden, 401 U.S. 560, 564 (1971).  This standard requires a showing of "a probability or substantial chance of criminal activity, not an actual showing of such activity." Illinois v. Gates, 462 U.S. 213, 243 n.13 (1983).  Sufficient information must be presented to the magistrate issuing such a warrant to allow her to determine independently whether probable cause exists.  Id. at 239.  In reviewing the adequacy of probable cause for a warrant, a reviewing court is "tasked with making a judgment based on what appears within the four corners of the affidavit."  United States v. Tanguay, 787 F.3d 44, 53 (1st Cir. 2015).  It is well settled that there is "'a presumption of validity with respect to the affidavit supporting the search warrant.'" United States v. Tzannos, 460 F.3d 128, 136 (1st Cir. 2006) (quoting Franks v. Delaware, 438 U.S. 154, 171 (1978)).

Where a defendant challenges the legality of a search conducted pursuant to a search warrant, he bears the burden of showing by a preponderance of the evidence that the search was unlawful.  United States. v. Legault, 323 F. Supp. 2d 217, 220 (D. Mass. 2004); see United States v. Burdulis, No. 10-40003, 2011 WL 1898941, at *3 (D. Mass. May 19, 2011) (citing cases).  The issue for the reviewing court is whether "the totality of the circumstances" in the affidavit afforded the issuing judge a "substantial basis for determining the existence of probable cause" for the search.  Gates, 462 U.S. at 238.  A reviewing court "must examine the affidavit in a practical, commonsense fashion" and "accord considerable deference to a magistrate's determination that information in a particular affidavit establishes probable cause."  United States v. Feliz, 182 F.3d 82, 86 (1st Cir. 1999) (internal quotation marks and citation omitted).

      *1.*     *Particularity of the Search Warrant*

The Fourth Amendment requires that a search warrant "must demonstrate probable cause to believe that (1) a crime has been committed . . . and (2) enumerated evidence of the offense will be found at the place to be searched." United States v. Ribeiro, 397 F.3d 43, 48 (1st Cir. 2005) (citation omitted). DeChristoforo challenges the second element, the nexus element on two fronts. First, he challenges SA Frost's reliance on CWs, arguing that that there was no corroboration of DeChristoforo's criminal conduct as alleged by them. D. 85 at 9. Second, even assuming that it was proper for the agent to rely on the information from the CWs, he contends that it was stale information and did not provide probable cause to believe that evidence of alleged drug trafficking would be found at either his residence or his office at the time the search warrants were issued and executed. Id. at 11.

As to his first contention, there was probable cause to believe that the items sought in search warrant would be found at both locations associated with DeChristoforo and that was based not only on the information from the CWs, but sufficient corroboration. "[F]actors that may contribute to probable cause include the 'veracity' or 'basis of knowledge' of person supply hearsay information, . . . whether informant statements are self-authenicating, . . . whether some or all of the informant's factual statements were corroborated wherever reasonable and practicable (e.g., through police surveillance); and whether a law enforcement affiant included a professional assessment of the probable significance of the facts related by the informant, based on experience or expertise." United States v. Zayas-Diaz, 95 F.3d 105, 111 (1st Cir. 1996). "None of these factors is indispensable; thus, stronger evidence on one or more factors may compensate for a weaker or deficient showing on another." Id. Here, the totality of circumstances recounted in the Frost Affidavit supported probable cause. DeChristoforo takes issue with the hearsay supplied by CW1, who did not deal directly with DeChristoforo, but shared information about his purchase of

steroids and Adderall pills from suppliers supplied by DeChristoforo. It is not improper to rely on hearsay in a search warrant affidavit and DeChristoforo fails to credit the ways in which the information that the agents received from CW1 corroborates information received from two, other independent sources, CW2 and CW3, who worked directly with DeChristoforo in the distribution of drugs. CW1 recounted that DeChristoforo received packages from China and CW2 subsequently informed the agencies that DeChristoforo would wire money to China for the importation of drugs and would use different people and locations to receive those packages from China. CW1 reported that DeChristoforo used the company name, Millenium Labs, for his pills and that CW1 had seen this branding. Law enforcement agents later seized drug paraphernalia from the residence of CW3, who was supplied by DeChristoforo with drugs, that bore the brand name Millenium Pharmaceuticals. Some of the statements from CW2 and CW2 were self-authenticating (i.e., "through the very specificity and detail with which it relates the informant's first-hand description of the place to be searched," Zayas-Diaz, 95 F.3d at 111 (internal citation and quotation marks omitted)), particularly as to CW2's description of a hide in the attic of 402 Grove Street or CW3's description of drugs and cash in the kitchen there and drugs in a drawer at 110 Corporate Drive. DeChristoforo also appears to suggest that the criminal conduct relayed by the CWs must be corroborated by the police as opposed to some or all of their factual statements where practicable. Id.; see United States v. Dixon, 787 F.3d 55, 60 (1st Cir. 2015) (noting that "corroboration of even innocent activity reported in the tip may support a finding of probable cause") (internal citation and quotation marks omitted); see also United v. Bonilla, No. 15-10359-DJC, 2016 WL 5346933, at * 4 (D. Mass. 2016) (distinguishing Florida v. J.L., 529 U.S. 266, 268 (2000) where "the fact that the [informant's] identity was known to the officers (and thereby subject to some sanction if he was untruthful) distinguishes him from the anonymous tipster in

9

[J.L.]"). Here, the agents were able to confirm that DeChristoforo's residence and workplace as the CWs had identified, that he drove a BMW that was registered in the name of a company with which CW3 had identified he had some affiliation, saw that DeChristoforo (and others outside of 110 Corporate Park Drive) were loading large wooden objects including a box similar to the one seized from CW's residence containing pills and drug manufacturing and distribution paraphernalia) and then observed him in short meeting in a parking lot with the driver of a car rented to someone with a record of drug-related charges. Lastly, on this record, SA Frost provided the context of the significance of this information and observations based on his training and experience in drug investigations. For all of these reasons, there was sufficient factual basis for probable cause for the searches.

As to DeChristoforo's contention that the information contained in the Frost Affidavit was "stale" (i.e., not recent enough to suggest that the enumerated items relating to drug trafficking would be found at either location), the Court notes that the First Circuit has "repeatedly refused to assess an affidavit's staleness by counting the number of days between the events described in the affidavit and a warrant's issuance, as a merchant would beads on an abacus." United States v. Adams, 971 F.3d 22, 33 (1st Cir. 2020) (quoting United States v. Tiem Trinh, 665 F.3d 1, 13 (1st Cir. 2011)). Instead, the Court must consider a number of facts "bearing on staleness, such as the nature of the information [in the affidavit], the nature and characteristics of the suspected criminal activity, and the likely endurance of the information." Id. (quoting Tiem Trinh, 665 F.3d at 13-14). Here, the Frost Affidavit provided ample basis to believe that the two locations would contain items related to drug trafficking. CW2 and CW3, both drug dealers themselves, had distributed drugs for DeChristoforo and had insider information about his operation. The Frost Affidavit contained the information from CW2 that DeChristoforo used 110 Corporate Park Drive to

manufacture his drugs, but that he also had a hide at his residence (in the attic) where he likely kept money (which, the issuing court could have reasonably concluded would be cash from drug operations). CW3, who was criminally charged with distribution of pills that he received from DeChristoforo, also confirmed that he manufactured the pills at the 110 Corporate Park Drive location and that he had seen fentanyl pills and cash at 402 Grove Street. Although the timing of this observation by CW3 was not reflected in the Frost Affidavit, it is noted that CW3 was at DeChristoforo's residence as recently as the week before November 3, 2021, a short time before December 7, 2021 when the search warrants were sought and issued.

      Although CW2 indicated that DeChristoforo had paused his drug distribution for a month or so (and then resumed) and CW3 indicated that DeChristoforo had stopped his pill manufacturing eight to nine months beforehand because of a concern that he was being investigated, there was still sufficient, timely evidence that drug-related evidence would be found at both locations. First, the information in Frost Affidavit indicated that DeChristoforo was not only a drug manufacturer and distributor, but also a user of opioids. Although the locus of pill manufacture was the 110 Corporate Park Drive, there was evidence that he also secreted cash (according to both CW2 and CW3) and some drugs (fentanyl) (according to CW3) at his residence, 402 Grove Street. It is reasonable to conclude that a user and distributor of drugs would retain drugs and proceeds of same close at hand, in a residence, even if he had paused his manufacture of pills. Second, the information from the CWs, particularly CW2 and CW3 who had distributed drugs supplied by DeChristoforo, was recent, based upon information that they knew because of work with DeChristoforo, but also indicated that his drug distribution extended back a few years as CW3 indicated that he had supplied pills to CW3 as far back as 2019. Third, even if DeChristoforo had paused or stopped his drug manufacturing for a period of time, it does not follow that there would

11

no longer be a nexus for drug-related evidence at both locations. Tools and paraphernalia might still remain in the place of manufacture, 110 Corporate Park, and as CW3 indicated, there may still be previously manufactured drugs (i.e., the supply of drugs that CW3 observed in a drawer there in October 2021). This is particularly true of records of drug manufacture and distribution or receipts and airbills relating to the source(s) of supply as well as to cash proceeds. The "timeliness of probable cause is context-dependent and will vary both with the nature of the information and with the nature of the suspected offense." United States v. Encarnacion, 26 F.4th 490, 498 (1st Cir. 2022). "A primary consideration in evaluating whether an affidavit is sufficiently 'fresh' is whether it 'describes a single transaction or a continuing pattern of criminal conduct.'" United States v. Chalas, 478 F. Supp. 3d 143, 148 (D. Mass. 2020) (quoting United States v. Nocella, 849 F.2d 33, 40 (1st Cir. 1988)). With a continuing pattern of criminal conduct, the "shelf life" supporting probable cause related to such an "amorphous drug-trafficking enterprise" will be longer, Encarnacion, 26 F.4th at 498, and that is certainly the case here. The totality of circumstances reflected in the Frost Affidavit was that DeChristoforo manufactured and distributed pills including counterfeit Adderall laced with methamphetamine that he supplied numerous dealers including but not limited to CW2 and CW3, had distributed pills at least as far back as 2019 and manufactured and supplied others in significant quantities. On this record, where the shelf life of information is longer for a drug trafficking operation, there was probable cause to believe that drug-related evidence would be found at DeChristoforo's residence[2] and office.

---

[2] As DeChristoforo emphasizes, "[t]here is no 'per se rule automatically permitting the search of a defendant's home when he has engaged in drug activity.'" United States v. Fulcar, No. 23-cr-10053-DJC, 2023 WL 5153772, at *2 (D. Mass. Aug. 10, 2023 (quoting United States v. Roman, 942 F.3d 43, 51 (1st Cir. 2019)). "[G]eneral observations from police officers that drug dealers tend to store evidence in their homes" must be coupled with " 'specific observations,' or facts 'connecting the drug dealing to the home' to permit an inference of nexus to a defendant's

Accordingly, the Court concludes that there was probable cause in the four corners of the Frost affidavit that the evidence being sought in the search warrants would be found at both 402 Grove Street and 110 Corporate Park Drive.

> **B.**     **Even if Probable Cause for the Search Warrants Had Not Been Shown, the _Leon_ Good Faith Exception Would Apply**

Even if probable cause had not been shown here, the Court agrees with the government that the good faith exception under United States v. Leon, 468 U.S. 897, 926 (1984) would preclude suppression of the evidence here.

In the absence of any allegation that the magistrate judge was misled by information that the affiant provided that was false or that he would have known to be false but for his reckless disregard for truth, that the magistrate judge abandoned her detached and neutral role in issuance, that the affidavit was so lacking in indicia of probable cause that reliance upon it was unreasonable or that the warrant was so facially deficient that the agents could not have reasonably concluded that it was valid, the Leon exception applies. Id. at 923; United States v. Owens, 167 F.3d 739, 745 (1st Cir. 1999). Although DeChristoforo argues that the affidavit was so lacking in indicia of probable cause that reliance upon it was unreasonable, the Court cannot agree on this record even if it had found any credence to his challenges to probable cause as to the information provided by the CWs and staleness grounds. On its face, Frost Affidavit recounted information from several, independent sources giving rise to probable cause to believe that DeChristoforo manufactured and distributed illegal drugs, used opioids, used his work space to manufacture pills and had been

---

residence." Roman, 942 F.3d at 52 (quoting Ribeiro, 397 F.3d at 50–51 and United States v. Bain, 874 F.3d 1, 23–24 (1st Cir. 2017)).  Here, there were the general observations by SA Frost from his investigatory experience, but also specific information about DeChristoforo's operation from the CWs as summarized above.

13

observed to store drugs and case as his residence. Even if probable cause for the warrant was lacking, the suppression of evidence that DeChristoforo urges is not warranted. Id. at 926-927.

V.      **Conclusion**

For all of the aforementioned reasons, DeChristoforo's motion to suppress, D. 84, is DENIED.

**So Ordered.**

/s Denise J. Casper
United States District Judge